**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Criminal Case No.  13-031 (ESH) |
|  | : |  |
| v. | : | Sentencing Hearing: December 17, 2013 |
|  | : |  |
| **BENJAMIN B. GREY** | : |  |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing. After a trial, a jury convicted the defendant of all 21 counts of the indictment: five counts of Bank Fraud (18 U.S.C. § 1344); three counts of False Statement on a Loan Application (18 U.S.C. § 1014); six counts of wire fraud (18 U.S.C. § 1343); and five counts of First Degree Fraud (22 D.C. Code § 3221(a)).[1]

The defendant is a serial confidence man. He scams hardworking people, leaving them with crippling debt, damaged credit, and the shattering experience of being cheated by someone they trusted. He defrauds banks and credit unions. He pathologically repeats his offenses, again and again, when not incarcerated. And he does it for no good reason, just to support his thousand-dollar bar bills and high-end shopping sprees. The defendant's lengthy criminal history and relevant conduct make clear his continuing series of frauds and scams has not been deterred by previous arrests, convictions, or even the sentences previously imposed. Here, the only way to protect the public is by incapacitating the defendant with a lengthy term of incarceration.

---

[1] Prior to trial, the Court severed counts 16 and 23 of the original indictment, counts related to offenses involving an undercover ATF agent. The government moves this Court to dismiss those two counts at this time.

Accordingly, for each of Counts One through Eight (bank fraud, false statement on a loan application), the government recommends a sentence at the high end of the guideline range, calculated at 84 to 105 months, in the form of 105 months' imprisonment, followed by five years of Supervised Release, and a fine in an amount sufficient to cover the costs of imprisonment and supervision.  With respect to Counts Nine through Fifteen (wire fraud), the government requests the same sentence, except that the maximum Supervised Release term of three years should be imposed instead.  With respect to Counts Sixteen through Twenty-One (the D.C. Code fraud offenses), the government recommend sentences of 20 months incarceration, followed by three years of Supervised Release.  The government does not oppose running all such sentences concurrently.  In addition, the government recommends an order of restitution and an order of forfeiture in the amount of $189,065.33, with amounts as allocated in the Presentence Investigation Report ("PSR") at ¶ 202.

## BACKGROUND

**A. Procedural Background**

On August 23, 2012, the defendant was arrested on a complaint charging him with one count of Bank Fraud.  On January 25, 2013, a grand jury indicted the defendant on 23 counts including Bank Fraud, Wire Fraud, False Statements on a Loan Application, and First Degree Fraud.  These charges referred to criminal schemes in which the defendant defrauded:

Scheme #1: H.W. and Transportation FCU;
Scheme #2: J.B. and BB&T;
Scheme #3: J.B. and Arlington Community FCU;

Scheme #4: J.B. and District Government Employees FCU;
Scheme #5: R.F. and Navy FCU;
Scheme #6: W.H.; and
Scheme #7: An undercover agent from the Bureau of Alcohol, Tobacco, and
        Firearms ("ATF").

Prior to trial, the Court severed those counts relating to the defendant's attempts to defraud the undercover ATF agent (Counts 16 and 23) and the defendant proceeded to trial on the remaining charges. On September 17, 2013, a jury trial commenced on the remaining 21 counts of the indictment. On September 20, 2013, the jury returned a verdict of guilty on all 21 counts. Sentencing was scheduled for December 17, 2013.

### B. Factual Background

For factual background, the government chiefly relies on the evidence as presented at trial and the facts as presented at length in the PSR. *See* PSR at 5-14. To briefly summarize, however, between 2009 and his arrest in 2012, defendant Benjamin Grey held himself out to be the owner and operator of purported car dealerships called "Planet Cars, Inc." and "Greymaxx Automotive, Inc." The defendant defrauded both individuals and financial institutions by using various false pretenses, promises, and representations.

As the evidence showed at trial, the defendant promised to sell a car to each of H.W. and R.F. for their personal use. Induced by the defendant's false promises, H.W. and R.F. each sought and obtained car loans from credit unions and gave the car loan checks of $35,444.99 and $30,000 respectively to the defendant. But the defendant never purchased or provided any cars to H.W. or R.F. H.W. and R.F. both asked the defendant for their money back, but the defendant gave them a litany of false excuses, claiming – contrary to his own bank records – that the checks had not cleared. The defendant never returned the loan money to them or the credit union lenders. Instead, both H.W. and R.F. were left with the car loans outstanding. At first, they attempted to make payments on the car loans, despite not receiving any car. Trapped, R.F. paid $20,799.09 towards the fraudulent loan, while H.W. paid $6,599.36. *See* PSR ¶ 202. Ultimately, they were

unable to continue making the loan payments.  They defaulted and their credit was ruined – and the credit unions lost much of the value loaned.

For J.B. in 2009 and W.H. in 2010, defendant's scheme varied slightly but was essentially the same.  With J.B. and W.H., the defendant purported to enter into business partnerships with each of them.  In those partnerships, J.B. and W.H. would provide the funds, and the defendant would buy the cars at wholesale prices and resell them, splitting the profit afterwards.  At defendant's urging, between October 1 and 28, 2009, J.B. successively took out three car loans to purchase the cars.  W.H. entered his partnership with Grey in or about August 2010, financing it (W.H. believed) with personal funds from W.H.'s own bank accounts.  In both cases, the defendant took the victims' money, but never bought the cars as promised and never returned the money to J.B., J.B.'s lenders, or W.H.  As with other victims, each received false explanations from the defendant, delaying their realization they had been scammed.  Ultimately, J.B. was left with three car loans – about $90,000 in debt – with no vehicles or other means to pay them off.[2]  J.B. was forced to declare bankruptcy, relieving her from her debt but ruining her credit for years for to come.  With respect to W.H., the defendant continued to ask him for even more money to "wrap up" the deal.  W.H. declined to give him any more money, and instead cut his losses at $34,000, which the defendant quickly spent on his high-end lifestyle.

**GOVERNMENT'S POSITION ON SENTENCING**

---

[2] Indeed, the defendant even had J.B. take a fourth car loan of $40,000 to purchase a white BMW for him from a BMW dealership – the same white BMW defendant then fraudulently promises to sell to R.F.  But for J.B. finding that car (with the help of an MPD officer) and returning it to the dealership in exchange for forgiving her loan, J.B. would have faced another loan debt due to the defendant's fraudulent behavior.

As set forth above, the government recommends a sentence at the high end of the defendant's guideline range (84 to 105 months) in the form of 105 months' imprisonment. followed by five years of supervised release.

### A. The Guidelines

Section 2B1.1 of the United States Sentencing Guidelines provides a base offense level of seven. The loss amount, including relevant conduct, yields over $400,000, and therefore 14 levels are added pursuant to § 2B1.1(b)(1)(H). *See* PSR ¶ 92. Because the offense involved 10 or more victims, two levels are added pursuant to § 2B1.1(b)(2)(A)(i).[3] Due to the defendant's managerial role in the offense, another two levels are added. *See* § 3B1.1(c). *See* PSR ¶¶ 81, 95. Thus, the defendant has a total offense level of 25. With his Criminal History Category IV, the corresponding guideline range is 84 to 105 months.[4]

### B. The Factors in 18 U.S.C. § 3553(a) Support a Sentence at the High-End of the Guideline Range

#### 1. Nature of the offense

---

[3] Under the Guidelines, "[v]ictim means . . . any person who sustained any part of the actual loss." U.S.S.G. § 2B1.1, Application Note 1. "Actual loss," in turn, "means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, Application Note 3(A)(i). "Pecuniary harm," in turn, "means harm that is monetary or that is readily measurable in money." Id., Application Note 3(A)(iii). The Guidelines make clear that, for purposes of calculating how many "victims" were involved in "the offense" under Section 2B1.1(b)(2)(A)(i), "the offense" includes both the charged offenses and all relevant conduct. *See* U.S.S.G. § 1B1.1, Application Note 1(H) ("'Offense' means the offense of conviction and all relevant conduct under §1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."). Because there is no limiting language in the relevant guidelines provision, it is clear that all victims of both the instant offenses and all relevant conduct should be included for purposes of calculating both the total loss amount and number of victims.

[4] As noted at PSR ¶¶ 115-116, defendant's criminal history calculation excludes an additional three points of criminal history for two convictions in Maryland that were instead included by the PSR writer in defendant's relevant conduct. If they had been included, those three points would have raised defendant's criminal history total to ten points, placing him in Category V.

In each case, the defendant's crimes are striking in their callousness towards his victims, if not sickening when one considers the extremely personal nature of the fraud and betrayal the defendant worked on J.B. and R.F. Each of the victims of the charged offenses, like so many, worked to earn a decent living, at the Department of Transportation, the D.C. Office of Chief Medical Examiner, and Verizon Wireless. Like so many, they worked to provide for themselves and their family; they hoped to improve their quality of life. In each case, however, the defendant undermined the victims' hard work, unsettling what they had built in their lives. The defendant exploited the trust they placed in him with his smooth presentation and confident manner. For H.W., J.B., and R.F., the defendant left them with staggering debt in the form of a worthless car loan, faced with the dilemma of either (1) paying a car loan for a car that would never come; or (2) defaulting and facing years of lawsuits, devastated credit, and bankruptcy.

The monetary loss to each victim only captures part of the damage that the defendant wrought upon them, however. These were not businesses that had engaged in a poor business deal with the defendant, resulting in a "loss" in a column of a spreadsheet. Rather, these were people who placed their trust in the defendant who shoved them into making a decision that directly affected their livelihood. Their outstanding debt served to be a tremendous burden on their shoulders as they attempted to right their financial court going forward.

H.W.'s attempts to move forward were met with lawsuits from Transportation Federal Credit Union, which had an ironclad contract with him and ultimately started taking money directly out of his paycheck to satisfy the loan that he received because of the defendant. With his next car purchase, H.W. sought for a lender who would give him a car loan at a reasonable interest

rate. He found none. To this day, he is paying over nine percent interest on his car loan because of his history in this case.

The defendant left J.B. in his wake, not only heartbroken but also bankrupt. He won her trust with the "long con," proposing to marry her, shopping for and designing an engagement ring, wooing her by flashing cash (the very cash, mind you, she had borrowed and given him). Though she now realizes that she was fooled by the defendant's hollow promises, she remains stuck with the constant reminder of her ruined credit from the bankruptcy that she was forced to declare. For at least three more years, J.B. will have to inform every potential lender – whether for a home, car, or even a personal loan – of her former bankruptcy that she had to declare as a result of the defendant's swindling. Only after the bankruptcy period finally expires, only then, will J.B. be truly free to rebuild her credit.

R.F. was a friend of the defendant from high school. As the evidence showed at trial, after he returned from Iraq after suffering from an explosion, R.F. had difficulty transitioning back into the normal day-to-day life. He rekindled his high school friendship with the defendant, or so he thought. The defendant would take him out to night clubs and bars, and – just as with J.B. – the defendant flashed an exorbitant amount of cash. Soon, the defendant offered to sell R.F. a BMW *that J.B. owned* for a fantastic deal. Once the defendant deposited R.F.'s loan check into his bank account, he cut off all contact. R.F., who was struggling with post-traumatic stress disorder and a traumatic brain injury, testified at trial that he came from a family that always honored their debts. So, for months, R.F. kept current on the payments (paying over $20,000 towards the loan) by spending: (1) his disability benefits from the military and (2) his $24,000 salary at Verizon wireless. Over time, R.F. could no longer afford the payments, and the debt weighed on R.F. as

an additional stressor while he struggled with depression. Ultimately, R.F. defaulted on the loan and – much like H.W. and J.B. – he still suffers from poor credit, of which he is reminded every time that he applies for a loan.

With respect to W.H., he still is haunted by his experience with the defendant. W.H. makes decisions every day that affect his own personal financial well-being as well as the company that he runs. Before meeting Benjamin Grey, W.H. had only read about people who would look you in the eye, lie to you, and take your money and walk away. After being scammed by the defendant, W.H. always experiences a residual skepticism regarding any person with whom he has a business relationship, even when that individual has honest intentions.

At trial, the government presented Rule 404(b) evidence of other similar offenses perpetrated by the defendant: (a) defrauding a GW student, W.E., of $1,500 through fraudulent promises to obtain a luxury car at a discount for W.E., *see* PSR ¶ 65, and (b) defrauding a Nissan dealership in Bethesda, Maryland of a $42,322 sports car by uttering a bad check drawn on a purported Planet Cars bank account that had been closed over a year before. *See* PSR ¶¶ 66-67. (This latter offense is the subject of one of defendant's Maryland felony convictions, but in the PSR was included as relevant conduct rather than criminal history. *See* PSR ¶ 116.)

In addition, as described in the PSR, the defendant's other relevant conduct is vast, covering scams and frauds similar in nature to those perpetrated as part of the instant. Not counting the instant offense – or offense conduct of defendant's prior convictions – the PSR describes the following other offenses perpetrated by the defendant:

- September 17 to 23, 2008 – Stolen Check Scheme (Commerce Bank/S.S., $28,400). Four worthless checks totaling $28,400 (and noting "car payment" or "car repair") were deposited into defendant's bank account, with some funds withdrawn before the fraud was detected. *See* PSR ¶ 73.

8

- August 23, 2009 – Roommate want-ad scheme (S.B., $700).  Defendant tricked an apartment hunter into paying him $700 to rent an apartment with the defendant, who had no such apartment.  This offense is the subject of one of defendant's Maryland felony convictions, but in the PSR was included as relevant conduct rather than criminal history.  *See* PSR ¶¶ 74, 115.

- December 10, 2009 – Car Loan Scheme (V.R./Navy FCU, $29,600). This scheme was virtually identical to the car loan schemes perpetrated against H.W. and R.F. *See* PSR ¶ 69.  Ms. Reis submitted a victim impact statement, attached hereto as Exhibit A.

- February to March 2010 – Bad Check Scheme (Navy FCU, $7,124.11).  Defendant deposited and used worthless checks drawn on the same closed Planet Cars account through which he scammed the Nissan dealership.  *See* PSR ¶ 75.

- April 12, 2010 – Roommate want-ad scheme (M.A.W., $1,800).  Defendant tricked an apartment hunter into paying him $1,800 to rent an apartment with the defendant, who had no such apartment.  *See* PSR ¶ 76.

- October 13, 2010 – Stolen Check Scheme (K.S., $64,628.94).  An unauthorized, stolen check from an attorney visited by the defendant was deposited into defendant's GreyMaxx Automotive bank account with the memo noting "purchase." *See* PSR ¶ 70.

- November 22 to 23, 2010 – Stolen Check Scheme (R.G./M&T Bank , $10,700).  Defendant deposited two forged checks (with his own signature) into the same account defendant used in defrauding W.H. *See* PSR ¶ 77.

- December 17, 2010 – Fraudulent Car Sale Scheme (Cadillac Escalade).   Defendant, as he did in scamming R.F., was purporting to sell a car to which he did not have title, even forging false registration documentation to assist the scam. *See* PSR ¶ 78.

- September 1, 2011 – Stolen Check Scheme (Demichele/BB&T Bank, $28,457.39).  Defendant deposited a worthless check into a GreyMaxx account referencing a car purchase.  *See* PSR ¶ 79.

- August 2012 – Advance Fee Fraud Scheme (undercover ATF agent, $4,000).  Defendant attempted to steal $4,000 from an undercover ATF agent, claiming the $4,000 would be used to obtain a car for him.  *See* PSR ¶ 71.  This offense conduct was the subject of Counts 16 and 23 of the original indictment, which the government now dismisses.

- August 2012 – Advance Fee Fraud Scheme (undercover ATF agent).  Defendant attempted to steal funds from an undercover ATF agent, promising that if the agent provided him about $88,000, he could illegally obtain funds from a GreyMaxx bank account for him. *See* PSR ¶ 72.

9

## 2. History and characteristics of the defendant

To say that the defendant's criminal history is "extensive" is an understatement – even apart from the relevant conduct listed above. When the defendant was arrested, he was either pre-trial or on community supervision in five different cases in four different jurisdictions in three different states. His crimes are almost always financial in nature, and almost always involving automobiles. As exhaustively outlined in the PSR (¶¶ 102 through 120, with arrests not resulting in convictions at ¶¶ 121 through 146, and pending charges at ¶ 147), excluding traffic-related offenses, the defendant has at least four felony convictions:

(1)  Receiving Stolen Property in D.C. in 2007,
(2)  Unauthorized Use of a Motor Vehicle in Loudon County, Virginia, in 2009,
(3)  First Degree Theft in Montgomery County, Maryland, in 2010, and
(4)  Bad Check/Uttering and Theft over $10,000 but under $100,000 in Montgomery County, Maryland in 2010.

The defendant's criminal history clearly demonstrates that his criminal behavior will not be stopped while he is in the community. Even a cursory examination of his past sentences by state courts reveals that the defendant has never received a sentence involving a meaningful term of incarceration. Repeatedly, the defendant has been sentenced to either probation or, at worst, some relatively short term of incarceration (at most one year) to be followed by probation and a suspended sentence. Moreover, when given probation, the defendant has a proven track record: he performs horribly. Given the timeline between arrests and sentencings as outlined in the PSR, the defendant frequently re-offends with an arrest in another jurisdiction and then lies to his probation officer about the existence of that new case. For example, as with the defendant's probation in Loudon County for Unauthorized Use of a Motor Vehicle, the defendant "was

consistently dishonest with Probation Officer Grimm regarding his residence and the fact of his [new] cases in Maryland." PSR at ¶ 113.

The defendant's numerous, recent criminal convictions, his abysmal performance on probation and community supervision (which often ends in re-offending), and his consistently lenient sentences weigh heavily in favor of a sentence at the top of his guideline range.

   3. **The need for the sentence (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training**

The government's recommended sentence of 105 months' imprisonment reflects the seriousness of the offense, promotes respect for the law, and affords adequate deterrence. As proved at trial and as discussed above, the defendant gained the trust of a stranger, a friend, a girlfriend, and a businessman. He stole their money (or money they had borrowed), and left them to deal with the consequences of their crippling debt. Meanwhile, he spent the money on bars, restaurants, limousines, and hotels. The defendant's crimes may not have been violent, but they were still extremely personal in nature. The defendant sought, obtained, and then violated the trust of his victims, and the effects of these crimes are still being experienced by the victims today. Accordingly, they warrant a lengthy period of incarceration.

Moreover, the government's recommended sentence also provides just punishment for the offense and protects the public from further crimes of the defendant. Simply put, the defendant must be punished, and punished harshly. In a review of his criminal history, the defendant has already received leniency in his prior sentences from courts in other jurisdictions. The defendant repays such leniency with re-offending. For example, in his most recent term of incarceration, the

11

defendant had been sentenced to a year in prison for violating his probation in Loudon County. After serving over two months, the defendant filed a motion to reduce his sentence, which the judge granted and released him on probation in June 2012. *Within weeks*, the defendant met the undercover ATF agent who he then attempted to defraud by offering to provide him with stolen cars at a cheap price, which ultimately led to his arrest in this case in August 2012. The defendant has never received meaningful incarceration, and he has proven that he unquestionably deserves it. Moreover, the only clear pattern that emerges from his criminal history is that, upon his release, he will re-offend. The government's recommended sentence at the top of the guideline range also serves to protect the public from further crimes by the defendant for a substantial period of time.

**4. The need to provide restitution to any victims of the offense**

The government's recommended sentence also provides for restitution for the victims, who should be made whole because of the defendant's crimes. The unfortunate reality, however, is that the defendant squandered all of the proceeds of his criminal activity, and he has no assets. Even if the Court orders restitution, it will likely never be fulfilled and the victims' losses will be permanent.

## CONCLUSION

The defendant has been found guilty at trial for swindling more than ten victims out of hundreds of thousands of dollars, which he spent living a luxurious lifestyle. The recurring scams comprising the defendant's relevant conduct – and his extensive prior convictions and criminal – are striking in their scope, and the defendant has proven that he repays leniency with additional crimes. To protect the public and to punish the defendant, the government submits that the only

option is a lengthy term of incarceration. Accordingly, the government requests a sentence at the high end of the guideline range, that is – 105 months of incarceration – and an order of restitution and an order of forfeiture in the amount of $189,065.33.

        Respectfully submitted,

        RONALD C. MACHEN JR.
        United States Attorney
        D.C. Bar No. 447889


        By: _____/s/_____
        Jonathan P. Hooks
        Christopher Kavanaugh
        Assistant United States Attorneys
        Fraud and Public Corruption Section
        555 4th Street, N.W.
        Washington, DC   20530
        (202) 252-6731; (202) 252-6977
        Jonathan.Hooks@usdoj.gov
        Christopher.Kavanaugh@usdoj.gov

Dated: December 13, 2013